Michael S. Hiller (MH9871)
**HILLER, PC**
*Attorneys for Plaintiff*
641 Lexington Avenue
New York, New York 10022
(212) 319-4000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
DIMITRA DIMOPOULOU,                          :
:                 Civ. Case No.: 1:13-cv-07159
Plaintiff,              :
:
-against-                   :        **AFFIDAVIT OF**
:        **MICHAEL S. HILLER IN**
FIRST UNUM LIFE INSURANCE            :        **SUPPORT OF PLAINTIFF'S**
COMPANY, UNUM LIFE INSURANCE          :        **MOTION FOR A FINAL AWARD**
COMPANY OF AMERICA,                  :        **OF LEGAL FEES, COSTS AND**
BLACKSTONE ADMINISTRATIVE             :        **INTEREST**
SERVICES PARTNERSHIP, L.P., and        :
BLACKSTONE ADMINISTRATIVE             :
SERVICES PARTNERSHIP,                 :
L.P. HEALTH & WELFARE PLAN,            :
:
Defendants.          :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

State of New York     )
                                .ss
County of New York    )

      **MICHAEL S. HILLER**, having been duly sworn, deposes and says:

      1.     I am an attorney and the Managing Principal of Hiller, PC ("HPC"), attorneys for

Dimitra Dimopoulou ("Dimitra"), plaintiff in the above-captioned action.   I submit this Affidavit in

Support of Dimitra's Motion for a Final Award of Legal Fees in the amount of **$337,875.50**, costs in

the amount of **$2,694.95**, and interest in the amount of **$396,462.41**.

## PRELIMINARY STATEMENT

2.      As shown below, HPC has achieved substantial success in this action by forcing defendant First Unum Life Insurance Company ("Unum") to: (i) pay Dimitra's long-term disability insurance benefits ("LTD Benefits"), retroactive to November 30, 2010; and (ii) place her on benefit going forward. This is the precise relief requested in the Complaint.  The magnitude of this victory cannot be overstated.  For nearly 10 years, Unum repeatedly denied Dimitra's requests for LTD Benefits, asserting wrongly that: (a) there allegedly was no evidence of her disability; and/or (b) Dimitra was purportedly malingering.

3.      As Dimitra's lawyers, we, *inter alia*, assisted in the preparation of her LTD claim ("LTD Claim"); prepared her first appeal ("Original Appeal"); instituted this legal action (Complaint, Ex. 1); defeated Unum's motion for summary judgment; cross-moved against Unum, and obtained an order, finding that Unum acted arbitrarily and capriciously; obtained an order, remanding Dimitra's LTD Claim to Unum, with instructions directing Unum to reconsider the LTD Claim more equitably (Remand Order, Ex. 2); successfully moved for an order of interim legal fees (Legal Fees Order, Ex. 3); assembled voluminous records to support her post-remand LTD Claim ("Post-Remand LTD Claim") totaling approximately 830 pages; prepared her Post-Remand LTD Claim for submission to Unum; litigated the scope of Dimitra's obligations relative to her Post-Remand LTD Claim; prepared her post-remand appeal ("Post-Remand Appeal") (Ex. 4) after Unum wrongfully denied her Post-Remand LTD Claim; successfully opposed Unum's effort to dismiss this action; defeated Unum's contention that Dimitra's Post-Remand Appeal was untimely; successfully litigated the breadth of Dimitra's Post-Remand Appeal disclosure obligations; successfully opposed Unum's effort to further delay its decision on the Post-Remand Appeal; and eventually persuaded Unum to grant the Post-Remand Appeal, pay her 9+ years of back LTD Benefits, and place her "on benefit" going forward (Unum Benefits Approval Letter,

Feb. 28, 2020, Ex. 5).

    4.    As demonstrated in the accompanying Memorandum of Law, the standard for an award of legal fees and costs is the achievement of "some degree of success" in the lawsuit, such that the plaintiff receives a benefit as a result of the lawyer's work (*See* Memorandum of Law, Point I(A)).  As further shown below, an award from the plan administrator/insurer, granting benefits in response to a post-remand appeal -- precisely the circumstance presented here -- constitutes a substantial degree of success within the meaning of ERISA, and as such warrants an award of legal fees and costs to Dimitra (*Id.*, Point I).  As also demonstrated below, the lawyers and other professionals at HPC charged reasonable fees and costs for the work performed, and demonstrated a level of professionalism worthy of full payment (without reduction) of the sums owed by Unum.  Lastly, as reflected below, Dimitra is entitled to pre-judgment interest in the amount of $396,462.61.[1]

## RELEVANT FACTS

### *This Action*

    5.    By this action, Dimitra, pursuant to the provisions of her long-term disability plan ("Plan") and the ERISA Statute, challenged a determination by Unum to sustain its denial of her LTD Claim for LTD Benefits.  Dimitra suffers from multiple debilitating illnesses and conditions ("Conditions"), including, *inter alia*, Chronic Fatigue Syndrome ("CFS") and Fibromyalgia - both of which cause her to suffer with debilitating symptoms ("Symptoms") that prevent her from working in her occupation (Complaint, 46) (Ex. 1).  Under the Plan, Dimitra is entitled to total disability benefits in the amount of $8,505.74 per month until age 65 in the event that she is unable to work in her own

---

[1] We are constrained to mention that, prior to filing this Motion, we approached opposing counsel in an effort to reach an agreement as to fees, costs and interest issues without seeking judicial intervention. Notwithstanding our high hopes for a resolution, the parties were unsuccessful.  The reason that the parties were unsuccessful will likely be evident from the parties' respective submissions on this Motion.

occupation.

6.       Each of Dimitra's treating physicians over the last 10 years certified her total disability from her occupation; her former employer submitted an affidavit, attesting to Dimitra's inability to work in her occupation; and Dimitra and her family members each submitted sworn statements, providing detailed information, confirming her disability.  This is all in addition to voluminous medical records prepared by her medical providers, each of whom meticulously documented the progress of her disease and the exacerbation of her Symptoms since their onset.  Despite the foregoing however, Unum, without ever examining Dimitra, rejected her LTD Claim.

7.       When Dimitra submitted her Original Appeal of the denial of her LTD Claim, Unum adhered to its decision by issuance of a final determination, refusing to pay her LTD Benefits ("Determination").  Unum's Determination was arbitrary, capricious, unsupported by substantial evidence, and the product of biased decision-making.  Accordingly, Dimitra filed this action, interposing a series of objections to Unum's Determination, including, *inter alia*, that:

- defendant Unum wrongfully decided the LTD Claim (and denied benefits), not based upon whether Dimitra was able to work or was otherwise disabled from her occupation, but rather based upon whether Dimitra's Symptoms were caused by a specific diagnosis that met Unum's arbitrary diagnostic criteria (Complaint ¶78, Ex. 1);

- defendant Unum ignored the substantial (and indeed overwhelming) medical evidence of Dimitra's total disability (*Id.*);

- defendant Unum distorted notations by Dimitra's medical providers to make Dimitra's LTD Claim appear less meritorious than it plainly is (*Id.*);

- defendant Unum relied upon purported statistics in an attempt to discredit Dimitra's pain and physical limitations without ever examining her (*Id.* ¶78);

- defendant Unum "arbitrarily and selectively cherry-picked those records upon which to rely" in denying Dimitra's Claim (*Id.* 76); and

- defendant Unum, in denying the LTD Claim and Original Appeal, took actions inconsistent with the plain words of the Plan (*Id.* 96).

4

(collectively, "Objections").  Based upon the Objections, Dimitra asserted that Unum's Determination "is and has been wrongful, illegal, [and] arbitrary and capricious" (*Id.* 96).

***Value of Dimitra's LTD Claim and Unum's Efforts to Contest It***

8.      Dimitra was 36 years of age at the time she became disabled and filed her LTD Claim with Unum.  Dimitra's medical records reflected at the time that Dimitra's Conditions were (and are) permanent.  Dimitra's LTD Benefits are payable in the amount of $8,505.74 per month to age 65.  Thus, the financial matters at stake herein are and have been substantial.  All totaled, the value of Dimitra's Claim, assuming she were to live to age 65, is in excess of $2.8 Million, not including legal fees and pre-judgment interest (which bring the total to well in excess of $3 Million).[2]

9.      Unum vigorously contested this lawsuit for seven years, and Dimitra's LTD Claim for more than nine years, ostensibly due to the substantial size of the LTD Claim and the legal issues at stake.  After joinder of the issue and disclosure, the parties filed Motions for Summary Judgment, followed by oppositions and replies, and multiple and mutual requests for leave to file motions to strike.

***HPC Successfully Defeats Summary Judgment and Obtains the Remand Order***

10.      On January 26, 2016, this Court issued the Remand Order, directing Unum to reconsider its Determination of Dimitra's LTD Claim (Ex. 2). In its Remand Order, the Court specifically found that Unum's Determination to deny benefits in this case, even when viewed with full deference, "was inconsistent with the plain words of the Plan and arbitrarily ignored relevant evidence" (Remand Order

---

[2]The calculation is as follows.  As of Unum's eventual approval on February 28, 2020, Dimitra had accumulated 111+ months of past-due LTD Benefits at a rate of $8,505.74 per month.  The product of $8,505.74 per month times 111+ months is $944,420.16.  In addition, since Dimitra's date of birth is September 5, 1974, she is entitled to monthly LTD Benefits until September 5, 2039 -- another approximately 228 months since the grant of her LTD Benefits on February 28, 2020 (assuming she remains disabled, which, according to her physicians, is likely given her diagnoses of CFS and Fibromyalgia (diseases for which there are no cures).  The product of $8,505.74 per month multiplied times 228 months is $1,939,308.72 in additional LTD Benefits over the next approximately 20 years.  Together, past and future LTD Benefits equal $2,883,445.86, plus interest covering the last 9+ years, plus legal fees and costs – amounts which together will clearly exceed $3 Million.

at 11) (Ex. 2).  The Court further ruled that "Unum gave plaintiff insufficient notice as to the standard

by which it was assessing her claim and thus how her claim might be perfected," essentially depriving

her of the opportunity to prepare an appeal that could address Unum's alleged conclusions (*Id.*).

11.     Each of the Court's findings in the Remand Order corresponded with specific objections

Dimitra interposed in this action.  For example, the first of Dimitra's Objections – "defendant First

Unum arbitrarily attempted to analyze whether Dimitra's Symptoms were caused by a specific diagnosis,

rather than whether Dimitra's Symptoms rendered her totally disabled" (Complaint, ¶78)(Ex. 1)  -- was

accepted by this Court as follows:

> Unum's focus on whether plaintiff's symptoms satisfied diagnostic
> criteria rather than whether they limited her occupational performance
> was arbitrary and capricious (Remand Order at 11) (Ex. 2).

12.     The Court also accepted the following additional arguments we interposed:

| Dimitra's Arguments (cites to our papers) | Court's Rulings (cites to Remand Order) |
|---|---|
| Unum "arbitrarily and selectively cherry-picked those records upon which to rely" in denying Dimitra's Claim (Complaint  ¶76)(Ex. 1).<br><br>Unum ignored substantial medical evidence of Dimitra's total disability (*Id.*, ¶75). | "Unum's decision to deny benefits ... arbitrarily ignored relevant evidence" (Remand Order at 11) (Ex. 2).<br><br>Unum relied upon checkmarks on a Disability Status Update form submitted by Dr. Carpenter, but failed to reconcile them with the remainder of the statements contained in the form (*Id.* at 13), as well as the sworn statements from Dr. Carpenter that Dimitra "could not participate in daily employment" (*Id.* 15). |
| Unum's construction of the Plan is in plain violation of its terms (*Id.* ¶96). | "Unum's decision to deny benefits was inconsistent with the plain words of the plan" (*Id.*). |
| Unum ignored statements from Dimitra's husband (Memorandum of Law in Support of Summary Judgment, pp. 7, 16, (Dkt. No. 89). | Unum ignored ample evidence of the severity of Dimitra's symptoms, including the sworn statement of her husband (*Id.*). |

| Unum, in violation of ERISA, ignored the evidence provided by Dr. Deutsch, based upon the false proposition that evidence of disability after the submission date of the claim is irrelevant and carries no weight (*Id.* 16, n. 13). | It was arbitrary and capricious to exclude evidence submitted by Dr. Deutsch, as it is indeed relevant as to whether Dimitra suffered from CFS and Fibromyalgia on the date of her claim (*Id.* 15). |
|---|---|
| Unum arbitrarily and capriciously rejected evidence because it was deemed subjective (*Id.* 3, 13, 23, 25). | It was arbitrary and capricious for Unum to discredit evidence of Dimitra's symptoms because it was "subjective" (*Id.* 16). |
| Unum gave undue weight to Dimitra's attempt at exercise, particularly given that she was properly following medical advice (*Id.* at 18). | It was arbitrary and capricious for Unum to discredit Dimitra's complaints based upon her attempts at exercise given that "[Dimitra] followed her physician's instructions in an attempt to alleviate her symptoms" (*Id.*). |

13.     The Court thereafter remanded Dimitra's Claim, with instructions to Unum to avoid the errors replete throughout its Determination.  Among the most significant of the Court's instructions were those which directed Unum to: (i) focus on whether Dimitra's Symptoms limited her occupational performance regardless of whether, in the opinion of Unum's so-called "experts," she met diagnostic criteria for a particular illness; and (ii) consider evidence of disability from and after the date Dimitra filed her LTD Claim (Remand Order at 18, Ex. 2).

***HPC Prepared the Post-Remand Claim and Appeal***

14.     Following a dispute regarding the scope of the Court's Remand Order, the parties sought the Court's assistance.  After a telephone conference with the Court on March 18, 2016, the parties, rather than further litigating the issue, negotiated and ultimately agreed on the scope of the medical documentation that Dimitra would submit for the purpose of Unum's reconsideration of her LTD Claim on remand (Post-Remand Claim, previously defined).  The professionals at HPC thereafter assembled and prepared Dimitra's Post-Remand Claim totaling approximately 830 pages.  Unum denied the Post-Remand Claim, listing an assortment of allegations, including the absurd contention that Dimitra wasn't disabled ("Post-Remand Denial")(Ex. 6). The professionals at HPC then undertook to

7

prepare Dimitra's Post-Remand Appeal. The assembly of the medical records and other evidence of Dimitra's long-term disability consumed countless hours, as the paperwork was especially voluminous, totaling an additional approximately 420 pages. In addition, HPC endeavored to find a CFS professional with experience in evaluating the disease through the *objective* testing that Unum seemed to be demanding (even though submission of objective evidence of disability is not required under the Plan). Eventually, we found such a professional who performed a relatively new test known as a Cardio-Pulmonary Exercise Test or CPET. As Dimitra was unable to afford the full cost of the CPET, undersigned counsel absorbed half the cost for the two-day CPET, hopeful that the results would provide the objective evidence that Unum seemed to be demanding and would then force Unum to reconsider its position.

15.     The results of the CPET confirmed what Dimitra, her treating physicians, her former employer, and her family members had been saying for 10 years -- Dimitra is unable to work in her occupation due to CFS, Fibromyalgia and other physiological conditions (CPET Results, Ex. 4, p. 68-79). Follow-up reports were generated by Dimitra's CFS specialists who, once again, confirmed Dimitra's disability (Levine Report (Ex. 4, p.96-98 and CPET Report, Ex. 4, p. 68-79)). Undersigned counsel then collected all of the medical records, reports and testing and proceeded to conduct medical research pertaining to Dimitra's Conditions – not only to prove Dimitra's disability, but also to rebut the assortment of bogus allegations that Unum included in its denial of her Post-Remand Claim. The bogus allegations by Unum included, *inter alia*, that Dimitra supposedly could not be disabled because she gave birth to a daughter, had traveled on an airplane twice in 10 years, and had attempted to exercise at her physician's recommendation ("Unum's Bogus Defenses") (Unum's Post-Remand Denial, Ex. 6). Medical research confirmed that there was (and is) no scientific basis for Unum's Bogus Defenses. *Legal* research separately confirmed that each of Unum's Bogus Defenses failed (and fails) as a matter

of law.  Accordingly, after collecting all of the medical records, reports, testing results, and medical and legal research, we prepared a 65-page (singled-spaced) Administrative Appeal Letterbrief, rebutting Unum's Bogus Defenses (Post-Remand Appeal, Ex. 4, p. 1-65).

16.     Despite the overwhelming evidence of Dimitra's disability, Unum refused to pay the LTD Benefits, and argued that Dimitra's Post-Remand Appeal was supposedly untimely (Dkt. No. 150). Undersigned counsel then filed a six-page (single-spaced), well-researched letterbrief, confirming that, not only did Dimitra timely file her Post-Remand Appeal, but further, Unum had violated ERISA Regulations in failing to apprise Dimitra of her rights of appeal (November 25, 2019, Letterbrief, Ex. 7).  Ignoring the controlling precedent cited in undersigned counsel's letterbrief to the Court, Unum then sent additional correspondence, demanding that this action be dismissed or, in the alternative, that Unum be afforded an *additional four months* to render a decision on the Post-Remand Appeal (Dkt. No. 153).  We submitted a responsive letterbrief, answering Unum's dismissal arguments, and opposing any extension that would last four months (December 20, 2019 Letterbrief, Ex. 8).  The Court agreed with undersigned counsel and directed Unum to decide the Post-Remand Appeal within 60 days (*i.e.*, by February 28, 2020) ("February 28th Post-Remand Appeal Deadline") (December 30, 2019 Order, Ex. 9).

17.     Thereafter, Unum requested additional authorizations for release of all of Dimitra's medical records covering the last 10 years.  In response, undersigned counsel opposed the request and instead insisted that the authorizations be limited to the relevant records generated since the last time authorizations were provided.  Eventually, Unum relented and agreed to accept authorizations only from providers who had generated new records and reports regarding Dimitra's Conditions since the last submission of records.  In accordance with the more limited demand, undersigned counsel caused the additional authorizations to be sent to Unum on January 13, 2020 (Letter of Transmittal, Ex. 10).

9

18.     The following day (January 14th), Unum decided to demand, among other things, copies of Dimitra's psychiatric records, including psychotherapy session notes, even though she never made any claim for a mental-nervous disability (January 14th Email, Ex. 11).  Unum's demand for such psychiatric records and notes was especially frustrating, as undersigned counsel had recalled that the Administrative Record, consisting of over 2,000 pages by this point, (somewhere) included notations by Unum employees *acknowledging* that Dimitra did *not* suffer from a psychological or other mental-nervous condition that resulted in impairment.  Plainly, Unum's repeated concession that Dimitra did not suffer from a mental-nervous condition that resulted in impairment completely undermined Unum's suggestion that her psychotherapy records, including therapy sessions notes, could be relevant to the LTD Claim.  Simply put -- since Unum knew that Dimitra's Conditions were not affected in any way by a mental condition, Unum didn't need her psychotherapy records.  Ostensibly, Unum demanded the records either to harass Dimitra or to invite a litigation dispute which, Unum hoped, would result in the further extension of time within which to decide the Post-Remand Appeal to the 120 days that the Court had denied in December.  Accordingly, when Unum interposed the demand for psychological records and session notes, undersigned counsel scoured the voluminous Administrative Record to identify those notations.  Counsel for the parties then conducted a meet-and-confer conference call on January 16th to address the psychotherapy records and sessions notes.

19.     During the meet-and-confer call, we pointedly emphasized that Unum had already determined that Dimitra did not suffer from a mental-nervous condition that affected her ability to work.  In addition, following additional legal research, we argued that under New York law, which under the Federal Rules of Evidence governs issues of privilege in the Southern District (FRE 501), psychotherapy records and sessions notes are irrelevant and privileged unless a plaintiff places her mental or psychological condition and health in issue.  On January 17th, we emailed opposing counsel,

confirming in writing that Dimitra never alleged that her disability was, in any way, based upon or affected by any mental-nervous condition (Ex. 12), in response to which, Unum's counsel answered simply "Thank you," suggesting that Unum had decided to abandon its improper demand for psychotherapy records; however, as discussed *infra*, Unum raised the issue again on February 24, 2020.

20.     Meanwhile, on February 12, 2020, about two weeks before the February 28th Post-Remand Appeal Deadline, Unum suddenly decided, for the very first time, to demand (by telephone) that Dimitra submit to a physical examination.  The Court will recall that, in the Remand Order, Unum was encouraged (but not required) to schedule a physical examination of Dimitra rather than rely merely on simple medical "reviews" by Unum employees to decide the LTD Claim (Remand Order at 18, Ex. 2).  The Court's guidance was rooted in well-established case law, in which courts have observed that physical examinations are particularly important to resolution of LTD claims arising from symptoms reflective of CFS.  Nonetheless, rather than heeding the Court's well-founded guidance, Unum simply denied the Post-Remand Claim without conducting the examination and then waited until 16 days before the February 28th Post-Remand Appeal Deadline to request the examination Unum should have scheduled and conducted years earlier.

21.     To avoid a potential non-cooperation defense, undersigned counsel, rather than issuing an outright denial of Unum's inappropriate demand for a physical examination and psychological records and sessions notes, notified the Court of the circumstances and placed them into context – specifically, Dimitra's employment history; her rise through the ranks at her employer, Blackstone, from the temporary steno-pool to the executive suite, where she was promoted to the position of associate; the onset of her Symptoms; Unum's original acknowledgment that her LTD Claim was meritorious; Unum's initial payment of her LTD Claim in February 2010; Dimitra's fight to return to work in June 2010; the affidavit submitted by her supervisor, attesting to Dimitra's inability to work, notwithstanding

Dimitra's relentless efforts to continue her career at Blackstone; Dimitra's recurring LTD Claim, filed November 30, 2010; Unum's arbitrary and capricious denial of the LTD Claim and Original Appeal; Unum's cherry-picking of the records and undue emphasis on isolated notations which Unum claimed were favorable to a denial, without regard to the overwhelming medical and other evidence demonstrating Dimitra's inability to work; Unum's failure to comply with its own Plan; Unum's failure to disclose the standard by which it had decided Dimitra's Administrative Appeal; Unum's wrongful insistence upon submission of objective evidence and a diagnosis that met Unum's own (undisclosed) criteria with respect to claims arising from CFS; Unum's reliance upon in-house employee Scott Norris, whose history for wrongfully denying claims under similar circumstances had (and has) been widely criticized by the courts ("Norris"); commencement of this action; the motion and cross-motion for summary judgment; the Remand Order and the Court's suggestion in 2016 that Unum schedule and conduct a physical examination of Dimitra; Unum's failure to request, schedule or conduct the examination; the award of interim legal fees; the disputes over the scope of the Post-Remand Claim, medical records and related issues; disputes over the Post-Remand Appeal, its scope and its timeliness; Unum's request for dismissal of this action; Unum's insistence that Dimitra turn over confidential psychotherapy notes even though irrelevant and privileged; Unum's 11th hour demand that Dimitra submit to a physical examination, just two weeks before the February 28th Post-Remand Appeal Deadline; and Unum's repeated efforts to extend its February 28th Post-Remand Appeal Deadline (February 17, 2020 Letterbrief, Ex. 13).

22.     In opposition to our February 17, 2020 Letterbrief in which the foregoing issues were raised, Unum, on February 24, 2020, again demanded the physical examination and then unbelievably, re-demanded the psychotherapy notes Unum knew to be both privileged and irrelevant (Dkt. No.158). On February 26, 2020, we answered Unum's letter, re-addressing the impropriety of Unum's demands

for both a last-minute physical examination and copies of irrelevant and confidential psychotherapy records (February 26, 2020 Letterbrief, Ex. 14).  We also noted that Unum's position was entirely pretextual.  Specifically, we pointed out that, on February 7, 2020, Norris (Unum's medical reviewer whose biased, arbitrary and capricious opinions were responsible for the denial of Dimitra's Original Appeal), had sent correspondence to one of Dimitra's treating physicians (Susan Levine, MD), alleging to her that there was no evidence of disability as of November 30, 2010, and questioning the "time-relevance" of the CPET Results which confirm Dimitra's total work incapacity.  Thus, Norris was signaling that it was his intention to reject the results of the CPET and the reports by Drs. Levine and Keller as supposedly irrelevant to Dimitra's LTD Claim, and recommend denial of Dimitra's Post-Remand Appeal. Notably, Norris is the *same* medical reviewer who issued the original Determination to deny Dimitra's Original Appeal (*id.*), raising a substantial question as to the integrity of Unum's evaluation.[3]

23.     All of the foregoing presented Unum with a problem.  It was, at that point, February 26th – two days before the February 28th Post-Remand Appeal Deadline; and Unum had to consider the consequences of failing to render a decision on the Post-Remand Appeal.   The principal consequence of failing to render a timely decision on the Post-Remand Appeal would have been that Dimitra's LTD Claim would have been reviewed *de novo* by this Court. Unum's decision-makers and counsel must have known that a *de novo* review would have been a slam dunk for Dimitra.

---

[3]As reflected in the accompanying Memorandum of Law, plan administrators are prohibited by law from relying upon the same medical reviewer for post-remand appeals as were employed on the original appeal denial.  By using the same reviewer (and one previously criticized for arbitrary and capricious decision-making), Unum created an institutional incentive for that medical reviewer to come to the same conclusion he previously reached. Simply put -- Norris was much more likely to decide, in response to the Post-Remand Appeal, that Dimitra is not disabled than an independent reviewer; if Norris were to have found that Dimitra, notwithstanding his previous determination, had been disabled since 2010 -- he would effectively have been acknowledging that his arbitrary and capricious evaluation the first time around caused him to issue the wrong determination.

24.     In particular, *de novo* review would have included: (i) the uncontested evidence that Dimitra loved her job, which she fought tirelessly to obtain; (ii) that Unum had approved the LTD Claim in February 2010, after which, Dimitra, a former marathon runner, attempted a return to work even though unable to do so; (iii) that her supervisor determined that Dimitra could not perform the responsibilities of her occupation; (iv) that every physician who ever examined Dimitra confirmed that she could not perform the responsibilities of her occupation; (v) that Dimitra's husband submitted an affidavit, attesting to his having needed to absorb virtually all household responsibilities because Dimitra was symptomatic all day and slept most of the time; (vi) that Unum never examined Dimitra and thus was resigned to relying upon the opinions of Norris, whose history of biased decision-making had resulted in condemnation by the courts; (vii) that Dimitra had submitted to blood tests, the results of which confirmed that she has all of the blood markers of CFS; and (viii) that Dimitra underwent a CPET examination that provided further objective evidence of her disability.  In addition, we submitted an affidavit from the Dimopoulou family nanny, who confirmed that Dimitra was unable to assist with most childcare and household responsibilities.  Against this weight of evidence, Unum argued that Dimitra gave birth to a child and took two plane trips in 10 years – neither of which is legally or medically relevant and neither of which disproves the overwhelming weight of evidence that Dimitra has been totally and permanently disabled from her occupation since 2010.  Plainly, Unum could not afford to subject Dimitra's LTD Claim and Unum's repeated rejection of it to a *de novo* review. Accordingly, Unum either had to deny a claim for which no evidence of denial exists or grant benefits, since Unum could not afford to miss the February 28th Post-Remand Appeal Deadline.  Finally, on February 28, 2020, Unum granted the Post-Remand Appeal and agreed to pay Dimitra's LTD Benefits ("Benefit Award Letter") (Ex. 5).

25.     In its Benefit Award Letter, Unum agreed that Dimitra would receive her full LTD

14

Benefits retroactive to November 30, 2010, and be placed "on benefit" going forward -- precisely the relief requested in the Complaint (other than the interest, legal fees and costs which are sought in this Motion) (*Id.*; *see also* Complaint at 17, Ex. 1). Thus, undersigned counsel, after a nearly 10-year, heavily-contested legal battle, obtained for Dimitra the full relief she requested and to which she is entitled.[4]

## DISCUSSION

26.     As discussed in the accompanying Memorandum of Law, legal fees are payable to a plan beneficiary for the legal fees and costs incurred in connection with successful prosecution of a post-remand claim and appeal -- precisely the outcome obtained on Dimitra's behalf here (*See* Memorandum of Law, Point I).  The amount of legal fees is determined based upon the Lodestar method of computation (*Id.*, Point II).  The Courts also often engage in a five-step analysis reflected in the case law, although it isn't required (*Id.*, Point I).  The remainder of this Affidavit is devoted to the facts necessary for the Court to apply the Lodestar method and aforesaid five-step analysis to the computation of legal fees.

### MICHAEL S. HILLER (Lead Counsel)

*Prior Fee Application and Result*

27.     Before proceeding with a full statement of my background and qualifications, I emphasize that this Court, on February 3, 2017, approved legal fees and costs for services rendered by undersigned counsel at a rate of $660 per hour for having prevailed in this action on an interim basis -- specifically, defeating Unum's motion for summary judgment and obtaining the Remand Order finding

---

[4]Unum will argue in its opposition that its previous denials were the product of Dimitra's failure to produce evidence of her disability; however, such an argument presupposes that the evidence she previously submitted was insufficient.  As shown *supra*, the evidence of Dimitra's disability was overwhelming.  The only "physician" to contest Dimitra's disability was Norris, a Unum employee who never examined her and, who, as referenced earlier, is a biased decision-maker whose history of arbitrary and capricious opinions is a matter of record.

that Unum rendered an arbitrary and capricious determination by rejecting Dimitra's LTD Benefits and

failing to comply with the plain terms of the Plan, and directing Unum to reconsider Dimitra's LTD

Claim subject to additional instructions (Ex. 3).  That $660 hourly rate was provided at a discount off

of my full hourly rate at the time, $700.  Over the last three years, my hourly rate has increased from

$700 to $795 -- approximately four (4%) percent per year; however, my hourly rate for most of the

period during which the work on our time sheets was recorded was $750, representing an increase of

2.4% per year from $700 per hour, which represents a modest increase relative to the growing cost of

operating a professional services firm in New York City.[5]

28.     Even when calculating the increase from $660 per hour (the rate approved on the last

application) to $750 per hour, the increase is a mere 3.4% per year.  Under its Retainer Agreement with

Dimitra, HPC is entitled to raise its rates by up to _10% per year_ (the "10% Increase Provision") (Ex. 15).

The 10% Increase Provision is contained in every litigation retainer agreement we issue.[6]  Even so,

rather than increasing rates by the maximum of 10% per year authorized in the Retainer Agreement,

HPC limited the increases to 3.4% per year (for Dimitra and the other clients of HPC).  That 3.4%

---

[5]To provide some real-life perspective on the cost of running our New York City law firm, the landlord for our previous office space at 600 Madison Avenue, which we occupied for over 20 years (pursuant to multiple renewals beginning in the 1990's) wanted to increase our base rent by over 60% in 2018. Since we could not afford the increase, we relocated to 641 Lexington Avenue, where we were subjected to a much lower, but still significant 16% increase. Year over year, the lease includes rent increases and operating escalations which comprise additional increases in the cost of running HPC.  And those represent just two increases in our cost (_i.e._, base rent and operating escalations). The point of this note is not to suggest that anyone should feel sympathy for HPC.  We recognize that the world is beset with problems far more serious than those confronting our small firm.  Rather, I mention these issues to explain why it is that annual increases in hourly rates of approximately 3% are necessary and appropriate for law firms to remain in business. Thus, it is essential that the Courts keep pace with these increases, especially with respect to fee applications filed by lawyers who represent plan beneficiaries in ERISA cases -- cases in which the plaintiffs frequently lack the resources to pay their lawyers who must, therefore, rely upon the fee-shifting provisions of ERISA, which do not include a multiplier, for payment.

[6]For some transactional matters, HPC issues flat-fee retainer agreements, as to which no hourly rates apply. Thus, language pertaining to increases in hourly rates does not appear in those retainer agreements. HPC does not enter into flat-fee litigation retainers.

annual increase is designed to keep pace with the real estate escalations contained in HPC's new lease, growth in compensation paid to employees, rising insurance rates, and other cost increases associated with operating a law firm in New York City.[7]  It is respectfully submitted that the 3.4% per year rate increase is reasonable and appropriate.[8]

29.     Lastly on this point, it is notable that, on the prior legal fee application, the Court did not find that any of our time entries to be excessive.[9]  We trust that the Court will reach a similar conclusion on this fee application.

**My Experience**

30.     I graduated *cum laude* from American University Law School in 1991, and was a member of its National Moot Court Team, for which I was a semi-finalist in Appellate Advocacy.  Prior to my matriculation at American, I graduated with Honors from Union College (Schenectady, New York) in 1988.

31.     I am an attorney in good standing admitted to practice before the New York (1992) and New Jersey (1999) State Bars, the United States District Courts for the Southern (1993) and Eastern (1993) Districts of New York, and the United States Court of Appeals for the Second Circuit (1999).

32.     Since my admission to the New York State Bar, I have concentrated my practice in, *inter*

---

[7]*See* https://www.cnbc.com/2019/09/26/health-insurance-premiums-increased-more-than-wages-this-year.html (reflecting 3.4% per year increase in wages and a 4-5% per year increases in health insurance costs nationally).

[8]By contrast, had HPC increased its rates to the maximum amounts permitted under the Retainer Agreement, my rate would be in excess of $950 per hour – 26% higher than the amounts charged to Dimitra.

[9]The only relatively minor deductions made from our invoices on the prior legal fee application pertained to work we performed (a) in litigating against co-defendants who were later dismissed from the action, and (b) in an effort to persuade the Court, based upon a declaration and expert testimony, that the *de novo* standard of review should be applied on the motion for summary judgment based upon Unum's previous acts of bad faith. Regarding (b), the Court disagreed with our position and denied that limited portion of the fees requested, but never suggested that we had not done the work recited in HPC's invoices or that the hours were inflated.

*alia*, the area of insurance law. Initially, I was employed at Wilson Elser Moskowitz Edelman & Dicker ("Wilson Elser") (1991-1993) as an associate representing many of the largest insurance companies in the world. In 1993, I left Wilson Elser and began representing policyholders *against* insurance companies; and I have continued that orientation of my practice to present day. From 1993 to 1995, I worked as an associate at Kurzman Karelsen & Frank, LLP. From 1996 to 2001, I worked as an associate, and later as an income partner, at Power Weiss & Kurnit, LLP. In 2001, Mr. Weiss and I splintered off to form Weiss & Hiller, PC. In 2014, Mr. Weiss retired from the practice of law, and I opened HPC, with the same practice concentration.

33.     Over the years, I have experienced considerable success as an insurance litigator. In 2002, I obtained, what was at the time, the largest reported verdict ever in the State of New York in a disability insurance trial involving claims for bad faith damages. (The insurer therein was First Unum, just as in this case.) Shortly thereafter, I pioneered the use of the RICO Statute to prosecute abuses by insurance companies in New York, again, against Unum.

34.     Our work on behalf of disabled insureds, however, is not limited to litigation. We represent disabled insureds and plan beneficiaries at all stages of the claim process, from inception, through claims administration, administrative appeal, and, if necessary, in litigation. Unlike many other litigators in this area, we endeavor to avoid the litigation process, as lawsuits inevitably delay disabled clients' receipt of the insurance proceeds they so desperately need. Accordingly, we also focus on the claims-administration and administrative-appeal processes. Only when these pre-litigation efforts are unsuccessful, as unfortunately was the case here, do we proceed with litigation.

35.     In my more than 20 years of disability insurance work, only two of the clients whose matters we have accepted for representation did not receive their disability benefits -- one client whom we later determined had not been honest with us (and we then dropped her representation) and the

other whose case was the sole disability case (or insurance case of any kind) that I have ever lost among the hundreds of insurance claims, litigations and arbitrations that I have handled in the nearly 30 years since my admission.  In other words, historically speaking, clients who have retained me and my law firms to handle insurance and disability matters have, in nearly every case, obtained a successful result, whether through pre-litigation efforts or through the court system.

36.     In recognition of my successes over the years, in 2010, I was named a SuperLawyer for the New York Metropolitan area, based upon my concentration in insurance law (Ex. 16).  I have continued to receive that honor every year since (*Id.*).  Also in 2010, I became a Life Member of the Million Dollar and Multi-Million Dollar Advocates Forums for my work that included highly successful outcomes obtained on behalf of clients with disability insurance claims and lawsuits (Ex. 17).

37.     In addition to my work in litigation, I have published the following articles on insurance law and litigation:

- *Aggrieved Disability Policyholders in New York are not Limited to Past Benefits as Remedy*, 74 NYSBA J. 6 at 32 (July/August 2002); and

- *Acts of War Exclusions Do Not Apply in Tragedy*, 226 N.Y.L.J. 56 at p.1, col. 1 (Sept. 19, 2001).

38.     In addition to my writings, I have been a featured speaker on insurance law and ERISA in particular, including:

- Guest Lecturer, New York University, Stern School of Business (2003), "How Trust Principles Inform the Courts' Interpretation of ERISA;"

- Featured Speaker, Association of Trial Lawyers of America (Feb. 2002), "The Aftermath of *Wurm v. Commercial Insurance*."

39.     I also have been consulted as a legal expert by, *inter alia*:  Dateline NBC, Lawyers Weekly USA, LawyersandSettlements.com, Law360, Politico.com, New York Times, Crain's, New York Post, New York Daily News, NY1 News, Commercial Observer, Village Voice, New York Law Journal, New

York State Bar Association Journal, New Jersey Law Journal, Trial Magazine, National Public Radio, WABC, WINS, WNYC, Brooklyn Courier, Brooklyn Papers, Brooklyn Eagle, and the television show "Law and Order."

40.     Aside from my client work, publications and lectures, I have, for the last 15 years, served as a Designated Mediator for the Commercial Division of the New York State Supreme Court; and from 2011 to 2016, I served as an Arbitrator for the City of New York.  I was also a member of the Faculty of John Jay College of Criminal Justice, teaching Criminal and Constitutional Law from 2005 to 2013. In 2019, I was invited back to John Jay to lead a Symposium on the Constitutional Process of Impeachment, relative to the then-pending investigation of Donald Trump.

41.     I have also received a series of awards and designations for my work outside the context of insurance law.  These include, *inter alia*: (i) Grassroots Preservation Award, for my work preserving historical, architectural and culturally-significant properties throughout New York City; (ii) Canna-Gather Advocate of the Year (2018) and the International Hope Award (2018) for my work in support of legalization of medical marijuana and expungement of the criminal records of those wrongfully incarcerated under the Controlled Substances Act; and (iii) being designated among the top 30 cannabis litigators in the United States by MG Magazine (2019).

42.     As reflected in the Affirmation of Scott Riemer dated May 16, 2016 ("2016 Riemer Decl."), who is also an eminent disability and ERISA attorney in his own right, I am "well-known and recognized as an expert in the field [of ERISA and insurance law]," whose counsel and advice with respect to disability insurance and ERISA matters, he has often sought out and requested (2016 Riemer Decl. ¶15) (Ex. 18, p. 14-15).

43.     As set forth *supra*, my hourly rate for work on behalf of HPC's clients, at all times relevant to this fee application, was $750 until January 1, 2020, at which point my rate increased to $795

per hour.  However, as previously mentioned, we have maintained my rate at $750 per hour for Dimitra

rather than applying current rates.  As reflected in the accompanying Memorandum of Law, my rates

are comparable to rates of similar attorneys who practice in this area (Memorandum of Law, Point II).

Mr. Riemer also noted that my rate is comparable to other leaders in the field and lower than his rate

(2016 Riemer Decl. ¶16; April 28, 2020 Affirmation of Scott Riemer ("2020 Riemer Decl."), ¶¶12, 15)

(Ex. 18).

**Senior Counsel Paul Kampfer**

44.     Mr. Kampfer arrived at HPC in 2019, and has been a valuable addition to our team.  In

my discussions with him and my review of his work, I have discerned that Mr. Kampfer is an

exceptionally knowledgeable and dedicated ERISA professional, with substantial experience representing

persons with disabilities.

45.     Mr. Kampfer graduated from Albany Law School in 2005.  He graduated from Union

College (Schenectady, New York) in 2001.  He is an attorney in good standing admitted to practice in

the State of New York (2006), the Southern District of New York (2006), the Eastern District of New

York (2006), the District of Connecticut (2017), and the Court of Appeals for the Second Circuit (2010).

46.     Prior to working at Hiller, PC, Mr. Kampfer was a partner at Riemer & Associates, LLC

from May 2017 through April 2019, focusing exclusively on claims/appeals/litigation for Long Term

Disability benefits under group and individual disability policies.  From April 2014 through April 2017,

Mr. Kampfer was an associate attorney at Riemer & Associates, LLC focusing exclusively on

claims/appeals/litigation for Long Term Disability benefits under group and individual policies.

47.     From October 2005 through March 2014, Mr. Kampfer was an associate attorney at

DeHaan Busse LLP focusing mainly on claims/litigation for Long Term Disability benefits under group

and individual policies. He also handled disability retirement cases under the New York State

Employees' Retirement System, the New York City Employees' Retirement System and the Federal Employees' Retirement System.

48.     Throughout his career, Mr. Kampfer has assisted hundreds of claimants in obtaining their long term disability benefits.  He has litigated approximately 50 Long-Term Disability cases under ERISA and New York State Law before the State and Federal Courts, and prepared well over 100 administrative appeals of denied Long Term Disability claims.  Mr. Kampfer has also assisted countless clients successfully apply for, and maintain, their Long Term Disability benefits without termination.

49.     Mr. Kampfer's hourly rate is $500 per hour, which is more than reasonable for an accomplished attorney with 14+ years of experience.

**Associate Fatima Afia**

50.     Ms. Afia came to HPC after distinguishing herself as an extraordinary college student at John Jay College of Criminal Justice.  A student in one of my Constitutional Law classes, Ms. Afia was among the two or three finest students I ever taught and received the highest cumulative grade I ever conferred in any of the classes I taught in my nine years of teaching.  When she graduated, I promptly hired Ms. Afia to serve as a paralegal until she was ready for law school.  Her work was consistently excellent.  During her law school career, Ms. Afia served as a summer associate and law clerk for HPC, during which she continued her outstanding work for the firm.  We promptly extended an offer to Ms. Afia for a full-time position at HPC.  Today, Ms. Afia is a core member of the HPC team and provides legal services at a level of sophistication that far exceeds what one would reasonably expect from a lawyer with three years of experience.  Ms. Afia's background further includes the following information:

51.     Ms. Afia graduated *cum laude* from Brooklyn Law School in 2016.  She graduated *summa cum laude* from John Jay College of Criminal Justine in 2011.  Prior to law school, Ms. Afia, as per the

paragraph above, worked as a paralegal at HPC from 2010 through 2013, when she began law school. While attending Brooklyn Law School, Mr. Afia, in addition to clerking for HPC, served as the Associate Managing Editor of the Brooklyn Law Journal of Law and Policy; clerked for the Honorable Ellen Gesmer of the New York State Supreme Court; interned in a highly-coveted clinic with the New York City Law Department where she represented the City of New York and its employees in connection with federal civil rights lawsuits against members of the Police Department and the Department of Correction; and interned in a clinical program with the New York State Attorney General's Office, representing the State of New York in enforcement actions against banks engaging in predatory lending practices against minority home buyers, and actions ensuring that minority/small business owners were being treated fairly by general contractors bidding on government contracts.

52.     Ms. Afia began working as a full-time associate at HPC in September 2016, and has contributed significantly to many of the firm's most successful practice areas including, *inter alia*, disability insurance law.  Ms. Afia is an attorney in good standing admitted to practice in the State of New York (2017), the Southern District of New York (2018), and the Eastern District of New York (2018).

53.     Ms. Afia's hourly rate as of December 2019 was $325 per hour.

***Senior Associate Jason Zakai***

54.     Mr Zakai, our most senior associate, came to HPC from Hughes Hubbard & Reed ("Hughes Hubbard") in 2016.  We quickly learned that Mr. Zakai is an outstanding attorney.  Since joining the firm, Mr. Zakai has helped us win an assortment of cases, including most recently our efforts to preserve from demolition, one of the first artist-in-residence loft buildings in Greenwich Village. Mr. Zakai's work includes, but does not concentrate in, disability cases, which is why his time on this matter is relatively limited in comparison to the other attorneys whose time is reflected.  Nonetheless, Mr. Zakai

provided invaluable assistance to the work we performed and the outcome we obtained. Mr. Zakai's background further includes the following:

55.     Mr. Zakai has been named a Rising Star in the New York Metro Area by Super Lawyers for the past three consecutive years. He has been practicing law for over 11 years and is admitted and is an attorney in good standing in the State of New York (2009), the Second Circuit Court of Appeals (2014), the Southern District of New York (2009) and the Eastern District of New York (2009).

56.     Mr. Zakai graduated *magna cum laude* from Brooklyn Law School in 2008 in the top six percent of his graduating class, and received a commencement award for academic achievement. He also received awards for his performance in his Legal Writing and Criminal Procedure classes. During law school, he was on the Executive Board of the Brooklyn Law Review and published a Note entitled "You Say Yes, But Can I Say No? The Future of Third-Party Consent Searches After *Georgia v. Randolph*," 73 Brook L. Rev. 421 (2007). Mr. Zakai also held several prestigious internships during law school, including for United States District Judge William H. Pauley, III in the Southern District of New York; for the United States Attorney's Office, Criminal Division, in the Southern District of New York; and for a New York City Councilman. In addition, he also participated in his law school's Criminal Appeals Clinic, in which he drafted an appellate brief and argued an appeal in the New York State Supreme Court Appellate Division, First Department, on behalf of the New York District Attorney's Office.

57.     Prior to law school, Mr. Zakai graduated *cum laude* from the University of Delaware, where he was an Honors Program Scholar, a Writing Fellow, and a member of Phi Beta Kappa. While an undergraduate, Mr. Zakai served as an intern for a United States Congresswoman in New York and for the reelection campaign of the Democratic Governor of Delaware.

58.     Mr. Zakai is a member of the New York City Bar Association and serves on the

24

Committee for New York City Affairs. He has previously served as an alumni mentor for law students at Brooklyn Law School, and as a mentor in the Ronald H. Brown Program for college students.

59.     Mr. Zakai's hourly rate as of December 2019 was $450 per hour.

**Senior Paralegal Susan Fauls**

60.     Ms. Fauls has been working with me since 1997, and has been involved in virtually every disability matter and litigation I have handled during that period. Ms. Fauls graduated with Honors with a Bachelor's Degree of Arts from the Writing Program at George Mason University. Thereafter, she worked for a number of publications, eventually serving as the editor of multiple academic journals, including, *inter alia*, Journal of Environmental Education, Current Magazine, and History: Review of New Books.

61.     Until January 1, 2020, Ms. Fauls' hourly rate was $175, when it was increased to $210 per hour. After reviewing the case law pertaining to hourly rates for senior paralegals, and given her 20+ years of experience and abilities, it is plain that Ms. Fauls' rates are undercharged. Not only does she handle the standard responsibilities of a senior paralegal, but she also proofreads and edits virtually all our documents, using the exceptional skills she honed in her many years as a magazine editor to improve our submissions to the State and Federal Courts before which we practice.

**Senior Paralegal Zachary Tyson**

62.     Mr. Tyson is a graduate of the University of Vermont (2013) with a Bachelor's of Arts in Sociology and a minor in Film Theory. While in college, he worked on the Vermont Family Inmate Survey (a joint project between Vermont's Department of Corrections and UVM). After graduation, Mr. Tyson became an Intern at the Chittenden County Public Defender's Office in Burlington, Vermont. Mr. Tyson worked his way up to Lead Intern and eventually Defense Investigator, assisting in both misdemeanor and felony cases. Mr. Tyson joined Hiller, PC in 2015 and has distinguished

himself as an outstanding paralegal, dedicated to the clients and causes the firm regularly supports.

63.     Mr. Tyson's hourly rate as of December 2019 was $150.  Based upon the case law cited in the accompanying Memorandum of Law, we are reasonably certain that we are under-charging for Mr. Tyson's time.

### The Results Obtained

64.     As reflected above, we fully prevailed on Dimitra's LTD Claim, having obtained full LTD Benefits retroactive to November 30, 2010, preceded by the Remand Order and an interim award of legal fees.  We have actually received the retroactive benefits ($944,420.16) as well as Dimitra's first on-benefit payment for the month of March.  And we have no reason to doubt her continuing receipt of LTD Benefits into the future.  Other than the costs, fees and interest requested herein, we have obtained _all_ of the relief Dimitra sought in this lawsuit.

### Billing and Hourly Rates

65.     HPC's hourly rates are as indicated above.  These are the hourly rates we charge HPC's more than 100 active clients, and the rates which those clients paid as of December 2019.  A spreadsheet of hours and the work performed with respect to each task by category is set forth herein below.

| | M. Hiller @ $750 | L. Weissman @ $285[10] | F. Afia @ $325 | P. Kampfer @ $500 | J. Zakai @ $450 | S. Fauls @ $175 | Z. Tyson @ $150 | G. Mungioli @ $135[11] | I. Moy @ $135[12] | **Total Hours** |
|---|---|---|---|---|---|---|---|---|---|---|
| Legal Fee App. 2016-2017 | 28.4 | 0.9 | 0 | 0 | 18.1 | 24.2 | 8.05 | 0.3 | 0 | 79.95 |
| Obtain/ Assemble/ Prepare Docs for Post-Remand Claim | 9.0 | 16.1 | 0 | 0 | 0 | 14.4 | 8.35 | 0 | 0 | 47.85 |
| Disputes Over Scope of Post-Remand Claim & Other Proc. Disputes | 31.0 | 3.7 | 17.3 | 0 | 0 | 11.3 | 3.8 | 0 | 0.3 | 67.40 |
| Research/ Prepare/ Obtain Docs. For Post-Remand Admin. Appeal | 15.5 | 0 | 140.4 | 0 | 0 | 1.7 | 10.5 | 0 | 0 | 168.10 |

---

[10]Owing to the *de minimus* nature of billing for the work performed by associate Lara Weissman, we do not include her biography as part of this application. However, I do note that Ms. Weissman is a 2012 graduate of Cardozo Law School and has worked for Disability Rights New York (which is a non-profit organization dedicated to representing people with disabilities).  At the time she logged her approximately 20 hours on this matter, Ms. Weissman was a fifth-year associate.  Given her experience, Ms. Weissman's billing rate of $285 per hour was, to say the least, competitive, if not a bargain and most likely was the product of a billing error (which will not be corrected on this fee application).

[11]Owing to the *de minimus* nature of billing for the work performed by Gina Mungioli (0.3 hrs), we do not include her biography as part of this application.

[12]Owing to the *de minimus* nature of billing for the work performed by paralegal Irene Moy (0.3 hrs), we do not include her biography as part of this application.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Prepare/ Finalize Post-Remand Admin. Appeal Letter | 24.5 | 0 | 2.3 | 76.25 | 0 | 14.7 | 3 | 0 | 0 | 120.75 |
| Disputes Over Rules Governing Post-Remand Admin. Appeal | 25.45 | 0 | 12.8 | 49.3 | 0 | 13.6 | 0.4 | 0 | 0 | 101.55 |
| Summary Judgment Motion | 0 | 0 | 0 | 24.9 | 0 | 0 | 0 | 0 | 0 | 24.90 |
| Legal Fee App. 2020 | 45.65 | 0 | 0 | 73.3 | 0 | 3.0 | 6.0 | 0 | 0 | 127.95 |
| **Total Billable Hours** | **179.5** | **20.7** | **172.8** | **223.75** | **18.1** | **82.9** | **40.1** | **0.3** | **0.3** | **738.45** |
| **Total Dollars** | $135,175 | $5,899.50 | $56,160 | $111,875 | $8,145 | $14,525 | $6,015 | $40.50 | $40.50 | $337,875.50 |

66.     A copy of HPC's invoice for this matter documenting the specific work done for each task is annexed as Exhibit 19 ("HPC Invoice").

67.     As noted in the HPC Invoice, the above chart does not include a voluntary reduction of 106.55 hours (*e.g.*, "No Charge" hours) resulting in a <u>voluntary reduction</u> in our fees totaling <u>$36,171.50</u>.

68.     As reflected in the accompanying Memorandum of Law, our rates are commensurate with the rates charged by other attorneys in the New York area (and other similar metropolitan areas) with comparable reputation and experience with a concentration in ERISA litigation.

***Record Keeping***

69.     All of the attorneys and paralegals at HPC maintain(ed) their time contemporaneously, which is entered directly into our computers as tasks are accomplished throughout the day.  We use Sage

Timeslips, a program which provides an onscreen interface to record time and services.  Time is recorded to the tenth of an hour.

70.     The Timeslips program is akin to a giant database and merge-file.  Employees record their time onto an onscreen Timeslip by inputting information into various fields.  Fields include, *inter alia*: name of client, date of work performed, description of work, time devoted to the work, and billing rate. The billing rate is preset for each employee to ensure that rates cannot be inadvertently altered.

71.     As for out-of-pocket expenses, HPC also uses the Sage Timeslips program.  Our office manager inputs costs that were specifically incurred with respect to each client.  As with the time entries, cost entries are inputted into an onscreen Timeslip, with multiple fields, including, *inter alia*:  name of client, category of expense (postage, Westlaw, FedEx, etc.), and the total incurred.

72.     In order to prepare an invoice that includes both lawyer/paralegal time and expenses, we set Sage Timeslips to assemble the data specific to a particular client (here, Dimitra), merge that data into a single spreadsheet, organize the data chronologically by date, and then print it.  This is executed by striking a "generate bill" key on the program.  I have been working with various iterations and versions of Timeslips programs since 1996 and have never seen or been made aware of a Timeslips computer-generated error in the calculation of time or expenses. To be clear -- it is accurate.

### How Time is Recorded

73.     The lawyers and paralegals at HPC are required to record their time in the same manner for each of our clients, irrespective of the type of matter being handled.  This serves, not only to ensure that time is properly recorded for purposes of billing and client and court inquiries, but also to evaluate and manage the workloads and performance of the professionals who work here.  The records are thus necessary to, and maintained in the ordinary course of, HPC's business.  *See* HPC Invoice at Ex. 19. I have reviewed the HPC Invoice, both onscreen and in its printed form, to ensure its fairness and

accuracy.  It is fair and accurate.

### Overview of Services Performed

74.    As reflected in the HPC Invoice, this case has been heavily litigated and aggressively defended.  We do not wish to become embroiled in arguments over the reason for the testiness of the litigation; rather, we emphasize, as reflected in ¶¶14-25 *supra*, that there is a great deal at stake here and the parties have litigated this case accordingly.

75.    As reflected in the HPC Invoice, HPC performed, *inter alia*, the following services:

- Review of Dimitra's policy and Unum's Determination to develop legal theories and strategies to proceed to litigation;

- Preparation of the Complaint;

- Review and marking of the Answer;

- Exchange of Pre-Trial Disclosures, including what was then a 1,200+ page Administrative Record;

- Preparation of a 20-page, singled-spaced Pre-Mediation Statement;

- Participation in a Mediation before the Magistrate;

- Review of, and preparation of a digest for, the Administrative Record in anticipation of motion practice ("Digest");

- Preparation of an Intra-Office Memorandum based upon the Digest to assist in assembly of 56.1 Statement of Facts, as well as the briefing process;

- Preparation of a Motion for Summary Judgment, and review of Unum's Cross-Moving papers;

- Preparation of Opposition to Unum's Cross-Moving Papers;

- Review of Unum's Opposition to Dimitra's Motion for Summary Judgment;

- Preparation of Reply to Unum's Opposition to Dimitra's Motion for Summary Judgment;

- Re-framing of the Motion for Summary Judgment after disputes arose between the parties pertaining to the first set of filings;

- Review and analysis of the Remand Order, reflecting successful defeat of Unum's Cross-Motion for Summary Judgment, and the partial grant of Dimitra's Motion for such relief;

- Preparation of a Legal Fee Application, and review of Unum's opposition thereto;

- Preparation of Reply to Unum's opposition to the Legal Fee Application;

- Assembly of records, reports and other data and materials for submission of Dimitra's Post-Remand Claim;

- Preparation of Post-Remand Claim for submission to Unum;

- Review of Unum's Determination, denying Post-Remand Claim;

- Review of the new, 2,124-page Administrative Record;

- Litigation of the scope and procedural rules pertaining to the Post-Remand Appeal process;

- Assembly of records, reports and other data and materials for submission of Dimitra's Post-Remand Appeal;

- Conduct medical and legal research for the Post-Remand Appeal;

- Endeavor to procure Dimitra's acceptance in a CPET study;

- Facilitation of Dimitra's CPET examination;

- Receive and review of the CPET Report;

- Arrangement for collection and assembly of post-CPET records and reports;

- Preparation of a 65-page, single-spaced Post-Remand Appeal;

- Successful opposition to Unum's Motion to Dismiss and Unum's demand for a declaration that the Post-Remand Appeal was untimely;

- Successful opposition to Unum's request for a four-month extension of its deadline to respond to the Post-Remand Appeal;

- Successful opposition to Unum's demand for 10-years of medical records;

- Successful opposition to Unum's 11th-hour demand for a medical examination;

- Successful opposition to Unum's improper demand for privileged and irrelevant

psychological records and sessions notes; and

- Review and analysis of Unum's Benefits Award, reversing the previous denials and granting Dimitra full LTD Benefits retroactive to November 30, 2010.

76.     The total fees incurred since the Interim Fee Award equal $337,308.00.  Given the enormity of the issues and financial compensation at stake – in excess of $3 Million – the legal fees, representing approximately ten (10%) percent of the recovery, are more than reasonable.[13]  Again, this includes a voluntary reduction of $36,171.50.

*Costs*

77.     HPC incurred **$2,694.95** in unreimbursed costs in connection with this action (Ex. 19, p. 60).  As reflected on the previous legal fee application herein, HPC does not up-charge expenses; we simply pass on the charges, whatever our costs are, without profit.  Each of the costs incurred were necessary to the prosecution of this action.

*Interest*

78.     As reflected below, Dimitra requests that she be awarded pre-judgment interest at the rate set by the State of New York – nine (9%) percent.  The Federal Courts have, on occasion, granted interest at the 9% rate, but have also, at times, regarded that such an interest rate could be viewed as providing a windfall to the plaintiff.  A full review of the federal cases pertaining to pre-judgment interest confirms that the assignment of an appropriate interest rate should be determined on a case-by-case basis (*See* Memorandum of Law, Point IV).  Here, the particular circumstances warrant the

---

[13]We expect that Unum will argue that the fees incurred post-remand should be less than those awarded in 2017.  According to Unum the preparation of, *inter alia*, the Complaint and Motion for Summary Judgment prior to remand, with respect to which Dimitra was awarded over $200,000 in legal fees and costs, should far exceed the post-remand work.  However, Unum's argument fails to consider the magnitude of the work we were required to perform after we prevailed on summary judgment, including the preparation of a 65-page (single-spaced) Post-Remand Appeal Letterbrief in which we were forced to address the multitude of Bogus Defenses interposed by Unum in its Post-Remand Denial.  *See* Delineation of Post-Remand Work Performed, ¶¶14-25, *supra*.  And none of the post-remand work would have been necessary had Unum fairly adjudicated this LTD Claim at any point from inception.

application of an interest rate of at least nine (9%) percent.

79.    From November 2010 to March 26, 2020 (when Unum belatedly paid Dimitra's back benefits totaling $944,420.16), Unum had the full benefit of the monies it withheld from Dimitra for more than nine years.  And those monies, as now confirmed by Unum, were wrongfully withheld. During that period, Unum was able to use the monies comprising Dimitra's LTD Benefits and invest them (along with the other monies in its accounts) for its own benefit.  Unum's average profit during that period (2010 to 2020) was 9.76% per year (Ex. 20), which is actually in excess of the New York pre-judgment interest rate of 9%.

80.    It is well established that defendants should never profit from or otherwise be rewarded for their wrongdoing (*See* Memorandum of Law, Point IV).  Because Unum did not grant Dimitra's LTD Claim in November 2010, Unum was not required to establish a reserve for the payment of her LTD Benefits.  Instead, Unum was able to invest the money that should otherwise have been paid to Dimitra, and earned an 9.76% profit on it for more than nine years.  For Dimitra to receive any amount less than the pre-judgment rate set by New York State would confer upon <u>*Unum*</u>, not only a mere *benefit*, but a ***windfall***, for wrongfully withholding Dimitra's benefits.  Worse, payment of interest at less than 9% would incentivize Unum to continue its practice of denying meritorious claims, as it would make Unum's decision to wrongfully withhold benefits profitable.

81.    Furthermore, had the funds been paid to Dimitra in a timely fashion, she might have generated an even better return on investment with her LTD Benefits than did Unum.  The S&P 500 during the period that Unum was investing Dimitra's LTD Benefits for its own profit grew at a rate of **13.64%** (Ex. 21).  Had Unum timely paid benefits, Dimitra could have invested the money at a higher rate of return than either the 9.76% Unum pocketed at her expense or the 9% requested hereby. Dimitra's request here -- 9% interest -- therefore, constitutes a fair outcome that would allow her to

33

recover some, but not all, of the time-value of her money, while at the same time, still allowing Unum

to retain some of the profit it earned at Dimitra's expense. Thus, Dimitra's request of 9% interest is

more than reasonable.[14]

82.    Dimitra received her retroactive LTD benefits on March 26, 2020, in the amount of

$944,420.16. Calculating interest at 9% using the midpoint between November 30, 2010 and March 26,

2020 (3,405 Days), Dimitra would be entitled to $232.87 per day multiplied by 1,702.5 days (the

midpoint) resulting in at total of $396,462.41 in pre-judgment interest.[15]   As reflected in the

accompanying Memorandum of Law, using the midpoint in the benefits payout is the appropriate

method of computing pre-judgment interest (Point IV).[16]

---

[14]We expect Unum to urge the Court to adopt a 4% interest rate or lower. However, we are not aware of any case in which an interest rate at that level was ever granted under circumstances in which the evidence confirmed that such an interest rate would allow the corporate wrongdoer, not only to profit from its own wrongdoing, but to generate a substantial windfall profit at the expense of the plan beneficiary whose time value of money is substantially less than the amount the corporate wrongdoer would receive. Again, we emphasize that Unum's return on investment during this period was 9.76%. Thus, to limit Dimitra's interest to 4% or less would be to allow Unum to profit substantially from its wrongful denials of Dimitra's LTD Claim and would encourage Unum to continue rendering decisions based upon the same arbitrary and capricious factors which led to the nearly ten-year delay in Dimitra's receipt of LTD Benefits herein.

[15]The arithmetic is as follows: $944,420.16 multiplied times 9% and divided by 365 days per year equals $232.87 per day of interest, which, when multiplied by 3,405 days equals $792,924.82. Because the interest accumulated on the past LTD Benefits over 9+ years on a monthly basis, the courts typically use the midpoint of the payout period to calculate interest, effectively halving the total interest figure. Here, half of $792,924.82 equals $396,462.41.

[16]We also anticipate that Unum will take the absurd position that interest would be payable only since November 12, 2019, when the Post-Remand Appeal was filed. According to opposing counsel, Unum allegedly did not receive proof of disability until that submission. However, such an argument presupposes that Unum fairly adjudicated the original request for benefits in 2010 – an argument that this Court, in its 2016 Remand Order, fully rejected. Furthermore, the evidence recited in ¶6 herein confirms that the proof of Dimitra's disability, prior to November 2019, was overwhelming, but that Unum cherry-picked through the records, de-emphasizing the proof establishing Dimitra's inability to work, while exalting and distorting isolated instances in which she attempted activity on the advice of her physicians. That Unum realized the absurdity of trying to defend its position prior to the inevitably adverse (to Unum) judicial determination does not constitute a basis to allow Unum to retain profit to which it was never entitled. Nonetheless, even assuming *arguendo* that Unum were right – and it isn't – opposing counsel's presumed argument would effectively ask this Court to grant <u>Unum</u> a windfall, inasmuch as Unum received the benefit of monies properly belonging to Dimitra over the last nine years. In effect, Unum would be asking this Court to allow

## CONCLUSION

83.     For the reasons set forth herein, we respectfully request that the Court grant Dimitra

legal fees in the amount of **$337,875.50**, costs in the amount of **$2,694.95**, and pre-judgment interest

in the amount of **$396,462.41**.

Michael S. Hiller

Sworn before me this
30th day of April, 2020.

Notary Public

Paul Kampfer
Notary Public, State of New York
No. 02KA6142705
Qualified in Westchester County
Commission Expires March 20, 2022

\* Notarization Pursuant to Executive Order 202.7.

---

to allow Unum to treat Dimitra as "the bank" for an unsecured  $944.137.14, 9+ year interest-free loan since
November 30, 2010.  Respectfully, I am unaware of any case law that would support such an outcome.